UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
COMMODITY FUTURES TRADING
COMMISSION,

                Plaintiff,                REPORT AND

    -against-                    RECOMMENDATION
                                  23 CV 120 (DLI)(RML)

MARK A. RAMKISHUN,

                Defendant.
--------------------------------------------------X
LEVY, United States Magistrate Judge:

        By order dated March 23, 2023, the Honorable Dora L. Irizarry, United States

District Judge, referred plaintiff's motion for default judgment to me for report and

recommendation.  For the reasons explained below, I respectfully recommend that the motion be

granted.

## BACKGROUND AND FACTS

        Plaintiff Commodity Futures Trading Commission (the "CFTC" or the

"Commission"), an independent federal agency, commenced this case on January 9, 2023 against

defendant Mark A. Ramkishun ("defendant" or "Ramkishun"), seeking injunctive and other

equitable relief, restitution, and civil monetary penalties.  (See Complaint, dated Jan. 9, 2023

("Compl."), Dkt. No. 1.)  According to the complaint, from March 2019 through September 2021

(the "Relevant Period"), Ramkishun operated a fraudulent commodity pool, Leo Growl LLC

("Leo Growl" or the "Pool"), a New Mexico limited liability company,[1] and "fraudulently

solicited and received at least $1.69 million from at least 34 individuals ("Pool Participants") for

the purpose of trading, among other things, commodity futures and options contracts in the

---

[1] Leo Growl was dissolved in March 2022.  (Declaration of CFTC Investigator Kara L. Mucha, dated Mar. 17, 2023, Dkt. No. 16-2, ¶ 9, Att. 4.)

Pool." (Id. ¶¶ 1, 12.)  The CFTC alleges that "Ramkishun traded less than half of the funds, resulting in net trading losses, and ultimately misappropriated a substantial portion of Pool Participant funds." (Id. ¶ 3.)  Defendant also allegedly "failed to operate the Pool as a separate entity from himself and otherwise mishandled Pool Participant funds." (Id.)  Because Ramkishun solicited and pooled funds for the purported purpose of trading commodity futures, options, and other financial products in a pooled account, he allegedly acted as a commodity pool operator ("CPO") without being registered with the CFTC as a CPO or exempt from registration, in violation of the Commodity Exchange Act (the "CEA" or the "Act"), 7 U.S.C. §§ 1–26. (Id. ¶ 4.)

The CFTC brings claims pursuant to section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Ramkishun's unlawful acts and practices and compel his compliance with the Act. (Id. ¶ 7.)  In addition, the CFTC seeks civil monetary penalties, restitution, and disgorgement. (Id.)[2]

## DISCUSSION

### A.  Default Judgment

Federal Rule of Civil Procedure 55 provides a two-step process for obtaining a default judgment. Priestley v. Headminder, Inc., 647 F.3d 497, 504 (2d Cir. 2011).  First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default," as it has done here. FED. R. CIV. P. 55(a).  Second, after a default has been entered against the defendant, and the defendant fails to appear or move to set aside the default under Rule 55(c), the court may, on a plaintiff's motion, enter a default judgment. FED. R. CIV. P. 55(b)(2); see also E.D.N.Y. LOC. CIV. R. 55.2(b).  A default constitutes an admission of all

---

[2]  In December 2022, Ramkishun was indicted by the Kings County District Attorney on fifty-six counts of financial fraud relating to the same alleged scheme. (See https://perma.cc/PJ48-MDV.)

well-pleaded factual allegations in the complaint, except those relating to damages.  See Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009); D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 107 (2d Cir. 2006); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

Plaintiff served defendant with the summons and complaint on January 19, 2023. (See Affidavit of Service of Travis J. Foster, sworn to Jan. 19, 2023, Dkt. No. 10.)  Defendant did not answer or otherwise appear in this action, and on February 17, 2023, the Clerk of the Court noted his default.  (See Certificate of Default, dated Feb. 17, 2023, Dkt. No. 12.)  Plaintiff moved for default judgment on March 22, 2023, and served its default submissions on defendant in compliance with Local Civil Rule 55.2(c).  (See Certificate of Service, dated Mar. 23, 2023, Dkt. No. 17.)  Plaintiff is therefore entitled to a default judgment against Ramkishun for his failure to answer or otherwise respond to the complaint.

B.  Liability

The complaint alleges three types of fraud: (1) fraud in connection with futures (7 U.S.C. § 6b(a)(1)), (2) fraud in connection with options (7 U.S.C. § 6c(b); 17 C.F.R. § 32.4 (2022)), and (3) fraud by a CPO (7 U.S.C. § 60).  (Compl. ¶¶ 41-58.)  All three of these counts stem from the same underlying fraudulent conduct, namely defendant's misappropriation of Pool Participant funds and repeated false and misleading statements, issuance of false records, and deception of existing and prospective Pool Participants about, among other things, the Pool's performance, the risk of loss, and defendant's trading and misuse of Pool Participant funds, "all in a calculated effort to fraudulently induce Pool Participants to place, maintain, and/or increase their investments in the Pool."  (Memorandum of Law in Support of Plaintiff's Motion for Entry of Default Judgment Against Defendant, dated Mar. 22, 2023 ("Pl.'s Mem."), Dkt. No. 16, at

12.)  7 U.S.C. §§ 6b(a)(1)(A)-(C) and 6c(b) and 17 C.F.R. § 32.4 (2022) collectively make it unlawful for any person, in connection with futures and options contracts, to (i) cheat or defraud or attempt to cheat or defraud another person; (ii) willfully make or cause to be made to another person any false report or statement; or (iii) willfully deceive or attempt to deceive another person by any means.  7 U.S.C. § 60(1) makes it unlawful for a CPO, using the mails or other means of interstate commerce, to (A) employ any device, scheme, or artifice to defraud any existing or prospective pool participant; and (B) engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any existing or prospective pool participant.

To establish fraud by misrepresentations and omissions in violation of 7 U.S.C. §§ 6b and 6c(b) and 17 C.F.R. § 32.4, the CFTC has the burden of proving three elements: (1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality.  See, e.g., CFTC v. R.J. Fitzgerald & Co., 310 F.3d 1321, 1328 (11th Cir. 2002); CFTC v. Highland Stone Cap. Mgmt., LLC, No. 11 CV 5209, 2013 WL 4647191, at *15 (S.D.N.Y. Aug. 29, 2013) (citing Saxe v. E.F. Hutton & Co., 789 F.2d 105, 109 (2d Cir. 1986)).  "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'"  R.J. Fitzgerald & Co., 310 F.3d at 1328 (citations omitted).  Thus, alleged misrepresentations or omissions should be given the meaning usually accorded them by an "objectively reasonable" person.  Id. at 1329; see also Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988) (a misrepresentation or omission is material if a reasonable investor would view it as "having significantly altered the total mix of information made available."); CFTC v. Int'l Fin. Servs. (N.Y.), Inc., 323 F. Supp. 2d 482, 500-01 (S.D.N.Y. 2004) (misrepresentations concerning risk go to the heart of an investor's investment decision and are therefore material as a matter of law) (citation omitted).

Proof of scienter requires evidence that "defendants had actual knowledge that the material statements they made were false, or that they were reckless in failing to discover their falsity." Highland Stone Cap. Mgmt., 2013 WL 4647191, at *15 (citing Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)). Recklessness is defined as conduct that is "highly unreasonable" and represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. (internal quotes omitted); see also First Commodity Corp. of Boston v. CFTC, 676 F.2d 1, 7 (1st Cir. 1982) ("A 'reckless' misrepresentation is one that departs so far from the standards of ordinary care that it is very difficult to believe the speaker was not aware of what he was doing").

A statement is material if it is likely that a reasonable investor would consider the matter important in making an investment decision. R.J. Fitzgerald & Co., 310 F. 3d at 1328 (internal quotation omitted); CFTC v. Mirror Trading Int'l Proprietary Ltd., No. 22 CV 635, 2023 WL 3190336, at *11 (W.D. Tex. Apr. 24, 2023); see also Highland Stone Cap. Mgmt., 2013 WL 4647191, at *15-16 (misstatements about trader's track record were material to prospective customers' investment decisions); CFTC v. Noble Wealth Data Info. Servs., Inc., 90 F. Supp. 2d 676, 686-87 (D. Md. 2000) (representations about profit potential and risk "go to the heart of a customer's investment decision and are therefore material as a matter of law"), aff'd in relevant part sub nom., CFTC v. Baragosh, 278 F.3d 319 (4th Cir. 2002). Moreover, a material misrepresentation or omission is a violation whether or not it induces investor action or inaction; it is sufficient that a material misrepresentation or omission is made to "attempt to cheat or defraud" or willfully to "attempt to deceive" a person. Int'l Fin. Servs. (N.Y.), Inc., 323 F. Supp. 2d at 502 (investor reliance need not be proven in an enforcement action alleging fraud) (internal

citation omitted).  Delivering, or causing the delivery of, false statements or reports to pool participants relating to transactions regulated by the Commission constitutes a violation of 7 U.S.C. § 6b(a)(1)(B).  See, e.g., CFTC  v. Weinberg, 287 F. Supp. 2d 1100, 1107 (C.D. Cal. 2003); Noble Wealth Data Info. Servs., Inc., 90 F. Supp. 2d at 687.

Fraud in violation of 7 U.S.C. §§ 6o(1)(A) and (B) is generally established by these same elements, with one exception: a violation of 7 U.S.C. § 6o(1)(B) does not require proof of scienter.  See, e.g., CFTC v. Driver, 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012) (CPO's "intentional or reckless . . . misrepresentations and omissions of material fact . . . violate[d] [7 U.S.C. § 6o(1)(A)-(B)]"), aff'd, 585 F. App'x 366 (9th Cir. 2014); In re Slusser, CFTC No. 94-14, 1999 WL 507574, at *14 (CFTC July 19, 1999) (7 U.S.C. § 6o contains no explicit "in connection with" requirement and, with respect to section 6o(1)(B), there is no scienter requirement), aff'd, Slusser v. CFTC, 210 F.3d 783 (7th Cir. 2000).

Here, defendant violated 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6c(b), and 6o(1)(A) and (B) and 17 C.F.R. § 32.4 (2022) through fraudulent misrepresentations and omissions and false records. As described in the complaint, defendant, acting as a CPO, engaged in a scheme through which he fraudulently solicited individuals in the United States to trade futures contracts and options on futures contracts through a purported commodity pool and used the mails or other instrumentalities of interstate commerce to do so.  (See Compl. ¶¶ 14-22, 30-34; Declaration of CFTC Investigator Kara L. Mucha, dated Mar. 17, 2023 ("Mucha Decl."), Dkt. No. 16-2, ¶¶ 11-16, 33-34.  The fraud consisted of, *inter alia*, numerous misrepresentations, misleading statements, deceptive omissions, and false records provided by defendant to existing and prospective Pool Participants.  (Compl. ¶¶ 14-22, 30-24; Mucha Decl. ¶¶ 11-16, 33-34.)

Defendant personally solicited the Pool Participants and controlled all of the bank and trading accounts through which Pool Participant funds flowed.  (Compl. ¶¶ 14-21, 23; Mucha Decl. ¶¶ 11-15, 17-21).  As such, defendant acted with scienter because he knew: (i) the representations, statements, omissions, and records he provided to existing and prospective Pool Participants were false, misleading, and intended to deceive; (ii) the payments he made to existing Pool Participants, which he falsely represented as trading profits, were paid from other Pool Participants' funds; and (iii) he was not entitled to the funds he misappropriated.  Defendant's fraudulent acts were material to existing and prospective Pool Participants because a reasonable Pool Participant would consider, among other things, (i) defendant's assurances of profit and guarantees against loss to be relevant to the decision of whether to place, redeem, hold, or increase the amount of a Pool investment; and (ii) the fraudulent account statements and purported profit payments received from defendant indicated that defendant's operations were legitimate, profitable, and sustainable when in fact they were not.  (See Compl. ¶¶ 32, 34, 36, 43-44, 49-50.)

Count IV of the complaint alleges that defendant violated the CEA by operating the Pool without being registered as a CPO.  (Compl. ¶¶ 59-62).  A commodity pool is defined in 7 U.S.C. § 1a(10) as "any investment trust, syndicate, or similar form of enterprise operated for the purpose of trading in commodity interests . . . ."  A CPO is defined in 7 U.S.C. § 1a(11) as "any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate or similar form of enterprise and who, in connection therewith, solicits, accepts, or receives from others, funds, securities or property . . . for the purpose of trading in commodity interests."  With certain specified exceptions and exemptions not applicable here, 7 U.S.C. § 6m(1) makes it unlawful for any CPO to make use of the mails or any

means or instrumentality of interstate commerce in connection with its business as a CPO unless it is registered with the Commission.  As described in the complaint, defendant acted as a CPO because, using the mails and other means of interstate commerce, he solicited and accepted funds for the purpose of trading commodity interests in the Pool and otherwise operated the Pool without being registered as a CPO or being exempt from registration.[3]  (Compl. ¶¶ 11, 13-14, 23; Mucha Decl. ¶¶ 8, 11, 16, 21-24.)  Therefore, defendant violated 7 U.S.C. § 6m(1).

Count V of the complaint alleges that defendant improperly operated the Pool in violation of Commission Regulations.  (Compl. ¶¶ 63-68).  17 C.F.R. § 4.20(a)(1)(2022) requires a CPO, whether registered or not, to operate its pool as a legal entity separate from that of the CPO.  17 C.F.R. § 4.20(b)(2022) prohibits CPOs, whether registered or not, from receiving pool participant funds in any name other than that of the pool.  17 C.F.R. § 4.20(c)(2022) prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.  See, e.g., CFTC v. Ramirez, No. 19 CV 140, 2019 WL 4198857, at *12 (S.D. Tex. July 12, 2019).  Defendant violated 17 C.F.R. §§ 4.20(a)(1), (b), and (c) by receiving and accepting Pool Participant funds into defendant's personal accounts, rather than an account in the name of the Pool, commingling Pool Participant funds with defendant's personal assets, and otherwise failing to operate the Pool as a separate legal entity from the CPO.  (Compl. ¶¶ 13, 23, 40, 61; Mucha Decl. ¶¶ 21-24.)

Having reviewed the well-pleaded allegations in the complaint, I find that the CFTC has established that defendant committed fraud in connection with futures (7 U.S.C. § 6b(a)(1)), in connection with options (7 U.S.C. § 6c(b); 17 C.F.R. § 32.4 (2022)), and by a CPO (7 U.S.C. § 60).  Specifically, during the Relevant Period, defendant, acting as an unregistered

---

[3]  In fact, Leo Growl has never been registered with the CFTC in any capacity.  (Compl. ¶ 12; Mucha Decl. ¶ 10, Att. 5.)

CPO, operated the Pool.  Defendant fraudulently solicited and received at least $1.69 million from the Pool Participants for the purpose of trading, among other things, commodity futures contracts and options on futures contracts in the Pool for the benefit of the Pool Participants. Defendant instructed Pool Participants to send their funds to one or more accounts he controlled, including bank accounts held in the name of the Pool and defendant's personal bank accounts, in which he commingled his personal funds with Pool Participant funds.  (See Compl. ¶¶ 13, 23, 40.)

In addition, defendant failed to operate the Pool as a separate entity from himself. Rather than use all of the Pool Participant funds to trade in the Pool, defendant traded less than half of the funds, resulting in net trading losses, and ultimately misappropriated a substantial portion of Pool Participant funds.  In order to conceal and perpetuate his fraud, defendant fabricated and distributed to Pool Participants fraudulent account statements, which falsely reported Pool Participants' profits and account values, and made Ponzi-type payments to some Pool Participants.  Defendant solicited personal friends, persons referred to him by his mother from her religious congregation, and other members of the public to participate in the Pool.  Defendant pitched himself to prospective Pool Participants as an experienced trader with a good track record of not losing money and told them they could expect to earn several thousand dollars per month in profits, depending on the size of their underlying investments.  Defendant told at least one Pool Participant that he was licensed with FINRA and that he had recently received $500,000 from one Pool Participant and $1 million from another Pool Participant for investment in the Pool, all of which was false.  Defendant primarily communicated to prospective and existing Pool Participants via telephone, text messaging, and email.  (See id. ¶¶ 1, 13-22, 30, 39.)

In soliciting Pool Participants, defendant knowingly or recklessly made fraudulent and material misrepresentations and omitted material facts.  For example, defendant told one Pool Participant that she could expect monthly profits of between $2,500 and $5,000 if she invested in the Pool, and he guaranteed monthly profits to at least two other Pool Participants. Defendant told another Pool Participant that if he doubled his investment in the Pool, his profit payments could double and that in no event would he lose his underlying investment.  Defendant would have no way to predict such profits and, in fact, the trading defendant did during the Relevant Period resulted in net trading losses.  (Id. ¶¶ 16-17.)

Defendant consistently downplayed the risks of participating in the Pool, in particular the likelihood of loss.  For example, defendant told at least three Pool Participants that they could never lose their underlying investments in the Pool, and further told one of these Pool Participants that his money would be secure, insured, and not subject to loss because defendant "monitored the markets."  Defendant told still other Pool Participants that they would lose little to none of their funds.  All of these statements were false and intended to convince these prospective Pool Participants to send defendant money in order to participate in the Pool.  (Id. ¶¶ 20-21.)

During the Relevant Period, defendant instructed Pool Participants to send their money to accounts he controlled, namely: (1) bank and credit union accounts in the name of Leo Growl, which defendant controlled; (2) defendant's personal bank and credit union accounts; and/or (3) a trading account in defendant's name.  Of the $1,694,300 received by defendant from thirty-four Pool Participants, defendant deposited less than $700,000 into trading accounts. Defendant's trading of these funds, which included the trading of futures contracts and options on futures contracts, resulted in net trading losses totaling $554,432.31.  (Id. ¶¶ 23-24.)  During

the Relevant Period, defendant returned $617,542 to Pool Participants, many in the form of Ponzi-type payments using funds from other Pool Participants, which defendant represented as purported profits from his trading despite never having earned such profits.  (Id. ¶ 25.)

Throughout the Relevant Period and on a nearly monthly basis, defendant fabricated and issued false account statements to Pool Participants. These account statements, which defendant generally sent to Pool Participants via email or social media, contained purported trading profits earned by each Pool Participant as a result of defendant's trading as well as the current total value of the Pool Participant's investment.  The account statements showed consistent monthly profits and a growing account balance in the Pool Participants' purported accounts.  For example, monthly account statements sent by defendant to two different Pool Participants showed the value of their investments had increased by $5,400 and $4,000, respectively, in both June and July 2021.  These statements were false because defendant's trading during this time period resulted in net trading losses of approximately $121,000 and $132,000 in June and July 2021, respectively.  (Id. ¶¶ 13, 24, 30-34.)

Furthermore, the fraudulent account statements were created using the letterhead of a major brokerage firm and addressed to the Pool Participants at their personal addresses, giving the false impression that accounts in the names of the Pool Participants had been opened at the brokerage firm.  In many of these statements, the account number was blacked out; however, in other statements the account number was revealed and pertained to an account in the name of defendant, not any of the Pool Participants or the Pool.  Defendant knew these account statements were false and sent them in order to conceal his trading losses and misuse of Pool Participant funds and to convince Pool Participants to maintain or increase their investments in the Pool.  (Id. ¶¶ 33-34.)

During the latter part of the Relevant Period, as new investments in defendant's scheme declined, defendant became increasingly unresponsive to Pool Participants' inquiries. Many Pool Participants repeatedly demanded that defendant return their money, only to be met with unfulfilled promises and falsehoods that payments were forthcoming, excuses and lies as to why their funds could not be returned, and/or bounced checks. Eventually, defendant ceased responding to Pool Participants altogether.[4] (Id. ¶¶ 36-38.) Despite repeated requests, few Pool Participants received their funds back from defendant—either in the form of promised returns or a refund of their principal investments. After making Ponzi-type payments to some Pool Participants during the Relevant Period, defendant had no other funds to return because he had misappropriated or lost in trading the remaining funds. (Id. ¶ 39.)

Because these facts establish that defendant repeatedly and with scienter engaged in core violations of the anti-fraud and registration provisions of the CEA and Commission Regulations, I respectfully recommend that defendant be found liable for the violations set out in the complaint.

C.  Relief

1.  Permanent Injunction

The CFTC may seek permanent injunctive relief "[w]henever it shall appear to the Commission that any . . . person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of [the CEA] or any rule, regulation or order, thereunder." 7 U.S.C. § 13a-1(a). Under such circumstances, a district court may issue a

---

[4]  For example, the last message one Pool Participant received from defendant on September 24, 2021 stated that he was "dedicating some time for [sic] concrete update for you later this afternoon." This Pool Participant never heard from defendant again. As another example, Defendant told a Pool Participant that he was selling his car in order to pay back the Pool Participant. This Pool Participant never heard from defendant again. (Compl. ¶ 38.)

permanent injunction without considering traditional equitable factors such as inadequacy of other remedies or irreparable harm.  CFTC v. Morgan, Harris & Scott, Ltd., 484 F. Supp. 669, 676-77 (S.D.N.Y. 1979); see also CFTC v. Muller, 570 F.2d 1296, 1300 (5th Cir. 1978).  The Commission need only show that the defendant violated the CEA and is reasonably likely to commit future violations.  CFTC v. LaMarco, No. 17 CV 4087, 2022 WL 18859042, at *16 (E.D.N.Y. Dec. 27, 2022), report and recommendation adopted, 2023 WL 2495869 (E.D.N.Y. Mar. 14, 2023); CFTC v. Kelly, 736 F. Supp. 2d 801, 804 (S.D.N.Y. 2010) (quoting CFTC v. Am. Bd. of Trade, Inc., 803 F.2d 1242, 1250-51 (2d Cir. 1986)).  "'A district court may properly infer a likelihood of future violations from the defendant's past unlawful conduct.'"  Kelly, 736 F. Supp. 2d at 804; see also SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975) ("past illegal conduct is highly suggestive of the likelihood of future violations"); Morgan, Harris & Scott, 484 F. Supp. at 677 (holding that "[w]hether such an inference should be drawn 'depends on the totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant.'") (quoting Mgmt. Dynamics, 515 F.2d at 807).

The scope of the injunctive relief can be tailored to meet the circumstances of the violations shown.  For example, upon the Commission's showing of a violation, courts have entered permanent injunctions against future violations of the CEA.  See, e.g., Am. Bd. of Trade, Inc., 803 F.2d at 1250-51 (affirming judgment enjoining defendants from engaging in conduct that constituted violations of the CEA).  Courts have also entered broader injunctions permanently prohibiting defendants from registering with the Commission and engaging in any commodity trading activity.  See, e.g., CFTC v. McDonnell, 332 F. Supp. 3d 641, 725-26 (E.D.N.Y. 2018) (imposing permanent trading and registration bans where defendants engaged

in a recurrent, systematic fraudulent scheme); CFTC v. SK Madison Commodities, LLC, No. 14 CV 2025, 2014 WL 3887755, at *2-3 (S.D.N.Y. June 9, 2014) (in default action, imposing permanent trading and registration bans on defendants for operating a fraudulent commodity pool).

As described in the complaint, defendant's repeated and extensive fraudulent misrepresentations and omissions made to Pool Participants to induce them to participate in the Pool and his misappropriation of Pool Participant funds warrants entry of a permanent injunction, including permanent registration and trading bans. Defendant's wrongful conduct was intentional and extensive and is unlikely to be deterred absent an order by this court. Accordingly, in order to prevent defendant from continuing to fraudulently solicit members of the public and otherwise continue his history of illegal conduct, I respectfully recommend that defendant be permanently enjoined from future violations of the CEA and Commission Regulations and from registering with the Commission and trading commodities in any capacity.

Specifically, I recommend that defendant be permanently restrained, enjoined, and prohibited from directly or indirectly:

1. Cheating or defrauding or attempting to cheat or defraud other persons in connection with any commodity futures contracts and options on futures contracts made, or to be made, on or subject to the rules of a designated contract market or willfully deceiving or attempting to deceive other persons by any means whatsoever regarding the disposition or execution of any such order or contract, in violation of sections 7 U.S.C. §§ 6b(a)(1) and 6c(b) and 17 C.F.R. § 32.4 (2022);

2. While acting as a CPO, using the mails or any means or instrumentality of interstate commerce, directly or indirectly, to employ any device, scheme, or artifice to defraud

14

any client or participant or prospective client or participant, or to engage in any

transaction, practice, or course of business which operates as a fraud or deceit upon any

client or participant or prospective client or participant, in violation of 7 U.S.C. § 60(1)(A)-(B);

      3. While acting as a CPO, making use of the mails or any means or

instrumentality of interstate commerce in connection with his business as a CPO without

registering with the Commission or being exempt from registration, in violation of 7 U.S.C. §

6(m)(1); and

      4. While acting as a CPO, receiving and accepting pool participant funds into

defendant's personal accounts rather than an account in the name of the pool, commingling pool

participant funds with defendant's personal assets, and otherwise failing to operate a pool as a

separate legal entity from the CPO, in violation of 17 C.F.R. §§ 4.20(a)(1), (b), and (c) (2022).

      I further recommend that defendant be permanently restrained, enjoined, and

prohibited from directly or indirectly:

      1. Trading on or subject to the rules of any registered entity (as that term is

defined in 7 U.S.C. § 1a(40));

      2. Entering into any transactions involving "commodity interests" (as that term is

defined in 17 C.F.R. § 1.3 (2022)) for his own personal account or for any account in which he

has a direct or indirect interest;

      3. Having any commodity interests traded on his behalf;

      4. Controlling or directing the trading for or on behalf of any other person or

entity whether by power of attorney or otherwise, in any account involving commodity interests;

      5. Soliciting, receiving, or accepting any funds from any person for the purpose of

purchasing or selling any commodity interests;

6. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9) (2022); and/or

7. Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

(See Proposed Order for Final Judgment by Default, Permanent Injunction, Civil Monetary Penalty, and Other Statutory and Equitable Relief, filed Mar. 22, 2023 ("Proposed Order"), Dkt. No. 16-1, at 18-19.)

2.  Restitution

7 U.S.C. § 13a-1(d)(3) permits the CFTC to seek equitable remedies for violations of the CEA, including "restitution to persons who have sustained losses proximately caused by such violation (in the amount of such losses)."  District courts have routinely ordered defaulting parties to pay restitution on behalf of defrauded customers along with pre- and/or post-judgment interest in actions brought by the CFTC.  See, e.g., LaMarco, 2022 WL 18859042, at *18 (awarding restitution against defaulting defendant); CFTC v. Friedrichsen, No. 18 CV 1830, 2018 WL 7253430, *6 (S.D.N.Y. Nov. 26, 2018) (awarding restitution with post-judgment interest); SK Madison Commodities, 2014 WL 3887755, at *3 (same); CFTC v. de Wet, No. 05 CV 8401, 2006 WL 2883044, at *1 (S.D.N.Y. Aug. 1, 2006) (awarding restitution with both pre- and post-judgment interest).

Although the court must make an independent determination regarding damages, an evidentiary hearing is not required; the court has the discretion to rely on affidavits or documentary evidence in the record to determine the appropriate sum.  Northern Adhesives, Inc., 2020 WL 6370060, at *2 (citing Cement & Concrete Workers Dist. Council v. Metro Found. Contractors, Inc., 699 F.3d 230, 234 (2d Cir. 2012)); see also SK Madison Commodities, 2014 WL 3887755, at *3 (in default action, awarding restitution based on the complaint, the application for default, and affidavits and other documentary evidence filed with the court).

The instant action is not a case where a defendant started a legitimate operation, suffered unexpected trading losses, and then began lying to clients about the losses.  Rather, defendant fraudulently induced prospective Pool Participants from the outset when he lied about his background, promised steady monthly profits, and assured prospective Pool Participants they could never lose their underlying investments.  (Compl. ¶¶ 14-22; Mucha Decl. ¶¶ 11-16.)  Further, he made Ponzi-type payments, issued false account statements, and otherwise kept lying in order to convince Pool Participants to maintain or increase the size of their investments, while simultaneously misappropriating their funds and covering up his trading losses. (Compl. ¶¶ 23-39; Mucha Decl. ¶¶ 21-34.)  "Where a defendant engages in systematic and pervasive fraud, all funds obtained by the illegal enterprise may be included in the calculation of restitution."  McDonnell, 332 F. Supp. 3d at 726-27 (citing CFTC v. British Am. Commodity Options Corp., 788 F.2d 92, 93-94 (2d Cir. 1986)).

The Pool Participants' "losses proximately caused by [defendant's] violations" in this case necessarily consist of the Pool Participants' total out-of-pocket losses—i.e., the total funds defendant solicited from Pool Participants ($1,694,300) minus funds he returned to Pool

Participants ($617,542) for a total restitution amount of $1,076,758. (Mucha Decl. ¶ 31.) Given that this figure can be determined with precision on the basis of trading and bank account statements and other records summarized in the Declaration of the CFTC Investigator, no further inquest into damages is required. Northern Adhesives, Inc., 2020 WL 6370060, at *2.

The decision whether to award prejudgment interest and its amount are matters within the district court's broad discretion. Commercial Union Assur. Co. v. Milken, 17 F.3d 608, 613 (2d Cir. 1994). An award of prejudgment interest is appropriate in cases involving investment fraud because it is only through the award of prejudgment interest that an investor who has been deprived of a specific sum of money can be made whole. Myron v. Chicoine, 678 F.2d 727, 733-34 (7th Cir. 1982).

Accordingly, I respectfully recommend that defendant be ordered to pay $1,076,758 in restitution, plus prejudgment interest, which reflects the total losses incurred by defendant's defrauded Pool Participants.[5] I further recommend that that prejudgment interest be calculated at the underpayment rate established by the Internal Revenue Service pursuant to 26 U.S.C. § 6621. See CFTC v. Commodity Inv. Grp., Inc., No. 05 CV 5741, 2007 WL 1519002, at *10 (S.D.N.Y. Feb. 27, 2007).

### 3. Civil Monetary Penalty

7 U.S.C. § 13a-l(d)(1)(A) and 17 C.F.R. § 143.8 (2022) provide that "the Commission may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation [of the CEA,] a civil penalty in

---

[5] The Commission requests that any restitution collected from defendant be turned over to the National Futures Association, which will serve as monitor to pay such amounts to defendant's defrauded Pool Participants, as set forth in the proposed order. (See Proposed Order.)

the amount of not more than the greater of $[214,514][6] or triple the monetary gain to the person

for each violation."  See CFTC v. Levy, 541 F.3d 1102, 1110-11 (11th Cir. 2008) (noting that the

number of violations for the purpose of calculating civil monetary penalties is not limited to the

number of counts in the complaint where the complaint alleges that "[e]ach material

representation and omission . . . is a separate and distinct violation" of the CEA) (internal

quotation marks and citation omitted).  Courts have broad discretion in fashioning an appropriate

penalty. 7 U.S.C. § 13a-l(d)(1)(A); CFTC v. Yorkshire Grp., Inc., No. 13 CV 5323, 2016 WL

8256380, at *6 (E.D.N.Y. Aug. 19, 2016) (citing Levy, 541 F.3d at 1112).  Conduct that violates

the core provisions of the CEA, such as customer fraud, should be considered extremely serious.

JCC, Inc. v. CFTC, 63 F.3d 1557, 1571 (11th Cir. 1995); see also In re Slusser, 1999 WL

507574, at *18 ("Customer fraud is a violation of the core provisions of the [CEA].  Such

conduct historically has been considered to be among the most serious of violations for purposes

of initially determining the severity of the sanctions to be imposed under the [CEA] and

consistently has warranted substantial civil penalties.") (internal quotations omitted).  Thus,

courts have routinely awarded significant civil monetary penalties in cases involving fraud.  See,

e.g., CFTC v. iFinix Futures, Inc., No. 12 CV 4843, 2013 WL 5798546, at *9 (E.D.N.Y. Sept.

16, 2013) (on default, defendants ordered to pay civil monetary penalty of $1,260,000 (9 x

$140,000) based on nine distinct violations of the CEA and Commission Regulations); CFTC v.

Cosmo, No. 09 CV 351, 2012 WL 5986525, at *3-4 (E.D.N.Y. Oct. 1, 2012) (on default,

ordering maximum allowable civil monetary penalty of $240 million (triple the monetary gain to

defendant) based on finding that defendant's fraud violations were intentional and significantly

harmed numerous investors).

---

[6]  For violations committed from November 2015 to the present, the penalty is $214,514 per
violation.  See 17 C.F.R. § 143.8 (2022).

A civil monetary penalty equal to triple defendant's monetary gain is warranted in this case. Defendant committed repeated violations of core provisions of the CEA and Commission Regulations that fraudulently divested at least thirty-four people of over one million dollars and attempted to conceal his fraud by, among other things, making Ponzi-type payments and providing fabricated account statements to them. (See generally Compl.; Mucha Decl.) Furthermore, the Commission alleged that the violations described in all five counts of the complaint are predicated on multiple instances of wrongdoing, and each instance is alleged as a separate and distinct violation. (Compl. ¶¶ 45, 51, 58, 62, 68.)

Defendant's monetary gain is calculated as: total funds provided to defendant from Pool Participants ($1,694,300) minus defendant's trading losses ($554,432.31) minus total funds returned to Pool Participants ($617,542) equals a monetary gain of $522,325.69. (Mucha Decl. ¶ 31.) Therefore, I respectfully recommend that defendant be ordered to pay a civil monetary penalty of $1,566,977.07, plus post-judgment interest in accordance with the terms set forth in the Proposed Order.

### 4. Post-Judgment Interest

"Pursuant to 28 U.S.C. § 1961, '[t]he award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered.'" Tru-Art Sign Co. v. Local 137 Sheet Metal Workers Int'l Ass'n, 852 F.3d 217, 223 (2d Cir. 2017) (citation omitted). The interest rate shall be determined by using the Treasury Bill rate prevailing on the date of entry of judgment. 28 U.S.C. § 1961.

### CONCLUSION

For the foregoing reasons, I respectfully recommend that plaintiff's motion for a default judgment be granted, that a permanent injunction be entered against defendant, and that

defendant be ordered to pay $1,076,758 in restitution and $1,566,977.07 in civil monetary penalties, plus prejudgment and post-judgment interest.  Plaintiff is directed to serve a copy of this report and recommendation on defendant by first-class mail, and to file proof of service within three (3) days.  Any objection to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days.  Failure to file objections in a timely manner may waive a right to appeal the District Court's order.  See 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(d), 72.

Respectfully submitted,

_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge

Dated: Brooklyn, New York
        September 12, 2023